UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| L.E., an individual,<br><br>    Plaintiff,<br><br> v.<br><br>LAKELAND JOINT SCHOOL DISTRICT #272, a political subdivision of the State of Idaho, M.D., an individual, J.W., an individual, and R.R., an individual.<br><br>    Defendants. | Case No. 2:17-cv-00512-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

This matter comes before the Court on Defendant Lakeland Joint School District #272's ("the District") Motion for Summary Judgment (Dkt. 42), and Motion to Strike (Dkt. 45). The Court held oral argument on May 15, 2019, and afterward took both motions under advisement. For the reasons set forth below, the Court DENIES the District's Motion for Summary Judgment (Dkt. 42), and GRANTS in PART and DENIES in PART the District's Motion to Strike (Dkt. 45).

## II. BACKGROUND

L.E. was an eighth-grade student at Timberlake Junior High during the 2012–2013 school year. Dkt. 43-3, at 7. That year, Shawn Lawler ("Coach Lawler"), the Timberlake High School cross country and track coach, pulled L.E. out of class along with a few

other students who were interested in joining the high school cross country team.[1] *Id.* Coach Lawler encouraged them to attend the Clearwater River Running Camp ("Camp") and promoted it as a team bonding experience. *Id.*

The Camp was operated by Lewis-Clark State College ("LCSC") and was held at LCSC's campus and the Johnson Bar Campground. Dkt. 42-4, at 2. Coach Lawler attended the Camp as a volunteer coach. *Id.* at 3. The District's male students[2] who attended the Camp shared tents. Dkt. 43-2, at 18, 20.

At the end of the third day of Camp, L.E. bathed and returned to his tent to change clothes. Dkt. 43-3, at 41, 42. While L.E. was wearing only his underwear, Defendants M.D., J.W., and R.R.[3] entered his tent. J.W. wrestled L.E. to the ground and pinned his arms down while R.R. pinned his legs. M.D. then forcibly pushed the handle of a toilet plunger into L.E.'s anus. *Id.* at 18–20. L.E.'s attackers exited the tent leaving L.E. in tears. *Id.* at 20–21.

After hearing that L.E. was upset, Coach Lawler spoke with him privately. Dkt. 43-2, at 24. L.E. cried as he told Coach Lawler that M.D. "shoved a plunger into [his] butt." Dkt. 43-3, at 23–24. After this conversation, Coach Lawler gathered the District's male students, chastised them for "screwing around," and had them apologize to L.E. Dkt. 43-2, at 25–26. Coach Lawler did not report the assault to the District. *Id.* at 20.

---

[1] Both Timberlake Junior High and Timberlake High School are part of the District. Dkt. 43-2, at 175.
[2] The Camp was held in July while school was not in session and while Coach Lawler was not under a coaching or teaching contract with the District. Dkt. 42-2, at 54. For clarity and consistency, the Court still uses "Coach Lawler" to refer to Shawn Lawler, and the Court likewise refers to minors who attended schools in the District as "students."
[3] M.D., J.W., and R.R. were the District's students. Dkt. 43-2, at 20, 53–54, 155.

After the Camp, L.E., M.D., J.W., and R.R. all attended Timberlake High School, and L.E., J.W., and R.R. ran on the school's cross-country team. Dkt. 43-2, at 14–15, 155; Dkt. 43-3, at 9. Throughout the year, M.D. and J.W. gave L.E. a "rough time." Dkt. 43-3, at 10. On one occasion during class, M.D. said to him, "You liked it in your ass." *Id.* at 33. M.D. also made multiple derogatory "gay jokes" about him. *Id.* On another occasion (following a track and field event), J.W. told L.E. that he would "get raped at State." *Id.* at 10.

During that 2013–2014 school year, Coach Lawler pulled L.E. out of a science class and asked him to attend the Camp again in the summer of 2014. *Id.* at 9, 30. Coach Lawler said L.E. would not need to pay because of what happened the prior year. *Id.* at 9. L.E. attended the Camp even though he was expelled from Timberlake High School shortly before the school year ended. *Id.* at 29–30.

Some time after the Camp in 2014, L.E.'s mother became aware of what happened at the Camp in 2013. Dkt. 43-2, at 108–09. On or about August 31, 2015, she reported it to Georgeanne Griffith, a District employee. [4] *Id.* at 35, 52–53. Thereafter, the District asked Coach Lawler to recount what happened at the Camp in 2013; and on September 4, 2015, he wrote a letter to the District explaining what he remembered. Dkt. 43-2, at 77. In that letter, Coach Lawler said L.E. told him that M.D. "had taken the plunger and pushed the plunger handle into [L.E.'s] anus." *Id.*

---

[4] Griffith told L.E.'s mother that the District would report the incident to the police. Dkt. 43-2, at 109. On September 17, 2015, Sergeant Carlos Martinez of the Idaho County Sheriff's Office began investigating. *Id.* at 161–68.

On September 28, 2015, the District issued two letters[5] regarding Coach Lawler's failure to report the assault. *Id.* at 68–69. The first letter officially reprimanded Coach Lawler, and the second letter alerted the Idaho Department of Education's Professional Standards Commission of his failure to report the assault. *Id.* The letters said Coach Lawler failed to fulfill his "professional obligation to follow School Board Policy #5260 regarding Abused and Neglected Child Reporting, Idaho Code 16-1605, and Principle IX(b) of the Code of Ethics for Idaho Professional Educators." *Id.*

However, Lisa Sexton, the District's Title IX Representative and Assistant Superintendent ("Assistant Superintendent Sexton"), wrote an addendum to the reprimand letter on January 8, 2017. *Id.* at 79. The addendum said that the reprimand and the Professional Standards Commission investigation were unwarranted and concluded that Coach Lawler "responded appropriately to the information he had." *Id.*

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, this Court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent

---

[5] The District has moved to strike these letters; however, as explained below, the Court declines to do so.

need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, this Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. ANALYSIS

### A. <u>The District's Motion to Strike (Dkt. 45)</u>

The Court first considers the District's Motion to Strike (Dkt. 45) because it concerns what evidence the Court may consider in deciding the District's Motion for Summary Judgment (Dkt. 42).

The District asks the Court to strike four items from L.E.'s Response to Defendant's Motion for Summary Judgment (Dkt. 43): (1) the Declaration of Brett Sokolov; (2) the two letters dated September 28, 2015; (3) M.D.'s confession that he inserted the plunger handle into L.E.'s anus; and (4) an answer in Assistant Superintendent Sexton's deposition. Dkt. 45, at 1–2. Each will be discussed in turn.

### 1. Brett Sokolov's Declaration

The District moves to strike the Declaration of Brett Sokolov[6] (Dkt. 43-5) "because it contains expert opinion concerning legal matters." Dkt. 45-1, at 2.

"As a general rule, 'testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.'" *Nationwide Transp. Fin. V. Cass Info. Sys., Inc.,* 523 F.3d 1051, 1058 (9th Cir. 2008) (quoting Fed. R. Evid. 704(a)). However, "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quoting *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002)). "In addition to prohibiting legal expert testimony which defines the governing law, courts have also prohibited legal expert opinion which applies the law to the facts." *Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1043 (D. Ariz. 2005).

In his Declaration, Sokolov first lays out his experience with Title IX. Dkt. 43-5. Then he provides his "analysis of and opinions in this matter" under the heading "Basis for Opinions and Conclusions." Dkt. 43-5, at 37. He defines what he deems the "[a]pplicable [l]egal [s]tandards," and he concludes that "[t]he record yields sufficient evidence for a court to find that the School failed to uphold the regulatory standards of Title IX and was deliberately indifferent to its obligations to comply with Title IX, to investigate and remedy discrimination on the basis of sex." *Id.* at 39. He applies the facts

---

[6] Sokolov is an attorney.

to law, and determines that Coach Lawler was an appropriate official with actual knowledge. *Id.* at 58, 63. He opines that Coach Lawler's response was "clearly unreasonable in light of known circumstances" and the District was likewise "clearly unreasonable." *Id.* at 64, 66. He summarizes his conclusions by saying "the School failed in all of its duties . . . to act to investigate and remedy in response to notice" of the assault. *Id.* at 68.

L.E. argues that "expert testimony can be allowed on matters crossing the line between factual and legal conclusions or in cases dealing with complicated legal standard." Dkt. 46, at 4. He quotes the following in support:

> Courts seem more open to the admission of expert legal opinions where the subject is the application of some complex regulatory or legal standard to a specific factual background. In such a context, the opinions often involve questions of law and fact that overlap to the extent that they are virtually indistinguishable.

29 C.A. Wright & V.J. Gold, Federal Practice and Procedure, Federal Rules Of Evidence, § 6264 n.36 (1997).

This is not that context. Because the Declaration contains opinions on ultimate issues of law, the Court hereby STRIKES the Declaration of Sokolov.[7]

**2.  The Letters Dated September 28, 2015**

Next, the District moves to strike "the letters dated September 28, 2015, to Mr. Lawler and the Professional Standards Commission." Dkt. 45, at 2. According to the District, the letters are subsequent remedial measures used to establish culpable conduct

---

[7] This holding does not mean Sokolov could not testify as an expert at trial. The Court reserves ruling on that issue until it is specifically raised by the parties.

and should be struck pursuant to Federal Rule of Evidence 407. Dkt. 45-1, at 4–5.

Additionally, the District argues that the letter to the Professional Standards Commission

must also be stricken because it contains hearsay. *Id.* at 6.

1. *Rule 407*

Federal Rule of Evidence 407 states:

When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
- negligence;
- culpable conduct;
- a defect in a product or its design; or
- a need for a warning or instruction.

But the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures.

Fed. R. Evid. 407.

L.E. does not contest that the letters are subsequent remedial measures; however,

he argues they are admissible under the above exception because they are used to show

control. Dkt. 46, at 5. The District disputes that it had control, and since these letters

could potentially show that the District had requisite control, they are admissible under

Rule 407.

2. *Hearsay*

As for the hearsay issue, the District argues:

The letter specifically includes hearsay when it states, "the mother of the abused student told a district level administrator that her son was raped while at the summer cross county camp in the Lewiston area." . . . What the mother said to a district level administrator is hearsay, as it is an out of court

statement being offered for the truth of the matter asserted that Plaintiff was abused and Mr. Lawler failed to report the incident of abuse."

Dkt. 45, at 6.

In the District's reply brief, the District asserts that both the letter itself and what the letter says L.E.'s mother said are hearsay. Dkt. 47, at 4.

"Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. Both the letter itself and the mother's statement conform with a hearsay exception.

The letter itself falls under the Rule 801(d)(2)(D) exception. Rule 801(d)(2)(D) provides that a statement is not hearsay if it "is offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). The Rule "takes the broader view that an agent or servant who speaks on any matter within the scope of his agency or employment during the existence of that relationship, is unlikely to make statements damaging to his principal or employer unless those statements are true." *Nekolny v. Painter*, 653 F.2d 1164, 1172 (7th Cir. 1981). Here the District's Superintendent, Brad Murray, wrote the letter in his official capacity to the Professional Standards Commission of the Idaho Department of Education. Dkt. 43-2, at 68. This letter is clearly a statement made by an agent or employee of the District on a matter within the scope of his employment. Thus, pursuant to Rule 801(d)(2)(D), the letter itself is not hearsay.

What L.E.'s mother told the District about the assault is also not hearsay. That

portion of the letter says, "This situation came to our attention this past month when the mother of the abused student told a district level administrator that her son was raped while at the summer cross country camp in the Lewiston area." *Id*. For a statement to be hearsay, it must be "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). The "matter asserted in the statement" is that L.E. was raped. But this is not why the statement is offered. Instead, L.E. offers this statement to prove the District had notice. Thus, this statement is not hearsay.

Because the letters are admissible under Rule 407 and the disputed statements are not offered to prove the truth of the matter asserted, the Court DENIES the Motion to Strike as it pertains to the letters.

### 3. M.D.'s confession that he "put the plunger in [L.E.'s] anus one time"

During the District's investigation, M.D. told Assistant Superintendent Sexton that he "put the plunger in [L.E.'s] anus one time." Dkt. 43-2, at 52–53, 71. The District moves to strike this confession from the record because it is hearsay.

L.E. argues that this statement qualifies under the Federal Rule of Evidence 804(b)(3) exception because M.D. has invoked his Fifth Amendment right against self-incrimination and is therefore unavailable and because this statement is against M.D.'s interest. Alternatively, L.E. argues that it could fall under the Rule 801(d)(2) exception.

The District argues that hearsay exceptions should only allow the statement to be used against M.D. and not against his codefendants. The District's argument is true for the Rule 801(d)(2) exception. Fed. R. Evid. 801(d)(2). However, unlike the Rule 801(d)(2) exception, there is no language in Rule 804(b)(3) that limits the use of such

statement against a codefendant.[8]

Rule 804(b)(3) provides that an unavailable declarant's statement is admissible if it is contrary to the declarant's interest. Fed. R. Evid. 804(b)(3). A statement is against interest when:

> (A) a reasonable person in the declarant's position would have made [it] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

*Id.*

The declarant is M.D., and he is unavailable because he invoked his Fifth Amendment right against self-incrimination. *See United States v. Wood,* 550 F.2d 435, 441 (9th Cir. 1976). The statement is against the declarant's interest because the confession clearly exposed M.D. "to civil or criminal liability,"[9] so the confession is admissible. *See* Fed. R. Evid. 804(b)(3)(A).

---

[8] The House of Representatives considered an amendment to "this exception to add a sentence making inadmissible a statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused." Fed. R. Evid. 804 (Notes of Committee on the Judiciary, Senate Report No. 93-1277). The amendment's purpose was to "codify the constitutional principle announced in *Bruton v. United States*, 391 U.S. 123 (1968)" that the "extrajudicial hearsay statement of one codefendant inculpating a second codefendant violated the confrontation clause of the [S]ixth [A]mendment." *Id.* However, the House committee ultimately "decided to delete this provision because the basic approach of the rules is to avoid codifying, or attempting to codify, constitutional evidentiary principles." *Id.* The confrontation clause is not, however, applicable to civil cases, and even the considered amendment was going to apply only to criminal cases and not civil cases.

[9] The prong (B) requirement of corroborating circumstances is not required because the case is not criminal. Fed. R. Evid. 804(b)(3)(B); Fed. R. Evid. 804 (Notes of Advisory Committee on 2010 amendments) ("[Rule 804(b)(3)] does not address the use of the corroborating circumstances for declarations against penal interest offered in civil cases.").

Therefore, the Court DENIES in PART the Motion to Strike as it pertains to the confession.

### 4. Assistant Superintendent Sexton's Deposition Answer

During her deposition, Assistant Superintendent Sexton was asked: "Would you agree that Coach Lawler has the authority to take corrective action against students who engage in hazing or bullying behavior?" Dkt. 43-2, at 54. She responded: "If Coach Lawler is the supervisor of record during his contracted time, he would be required, actually, to do that." *Id.* However, prior to her answer, the District's attorney objected to the form of the question, and lack of foundation. *Id.* The District now argues that Assistant Superintendent Sexton's answer cannot be considered until the Court rules on Defense counsel's objections.

L.E. argues that the Court should overrule the objection because "[t]he question posed to Lisa Sexton was clear and was based on her understanding of the relevant District policies and procedures." Dkt. 46, at 8. L.E. notes that "Sexton was designated by the District to testify on the District's behalf pursuant to FRCP 30(b)(6) and was also the Assistant Superintendent and Title IX Coordinator at the relevant times during this litigation." *Id.* Additionally, she "displayed her familiarity with the relevant policies and procedures within the District during her deposition and prior to the objection at issue in this case." *Id.*

The Court finds that the question was clear and proper foundation had been established. The District's objection is therefore OVERRULED.

**B. The District's Motion for Summary Judgment (Dkt. 42)**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Recipients of federal funding, like the District, may be liable for damages under Title IX for student-on-student sexual harassment. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999).

For student-to-student sexual harassment, there are four requirements for school district liability to attach under Title IX: (1) substantial control; (2) severe and pervasive harassment; (3) actual knowledge; and (4) deliberate indifference. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000). The Court discusses each factor in turn.

**1. Substantial Control**

First, the District's liability "is limited 'to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs.'" *Id.* (quoting *Davis*, 526 U.S. at 645).

The District contends that it did not exercise substantial control over M.D., J.W., and R.R. while they attended the Camp. It points to various factors in support of this position, including: the Camp was operated and managed by an outside organization; the Camp was not located on District property; school was not in session; Coach Lawler was working as a Camp volunteer rather than as a District employee; and Coach Lawler's teaching contract and supplemental coaching contract were not in effect. *See* Dkt. 42-1, at 5.

However, whether the District had control over the Camp is largely immaterial here because L.E.'s Title IX claim is not based upon the sexual assault that occurred at the Camp. To be sure, that attack provides important context for L.E.'s Title IX claim, but he is not saying the District is responsible or liable for the attack itself. Instead, L.E.'s Complaint states:

> The sexual assault on the Plaintiff was a severe form of sexual harassment. . . . District employees with the authority to address the sexual assault and institute corrective measures on the District's behalf against the student Defendants were deliberately indifferent to the sexual assault on the Plaintiff *and exposed Plaintiff to further harassment and a hostile environment at School following the assault.*

Dkt. 1, at 6 (emphasis added).

Thus, the District's focus on whether it exercised substantial control over the Camp is somewhat misplaced. What really matters here, is that Coach Lawler was allegedly aware that L.E. was sexually assaulted at the Camp, yet he did nothing to adequately correct the behavior or implement safeguards for L.E. at school the following year. The true nature of L.E.'s Title IX claim is that he was subjected to a hostile learning environment due to continued harassment at school, even though Coach Lawler knew that he had been sexually assaulted by fellow students the prior summer.

The District undoubtably had control over its students during the school year and over the allegedly hostile environment that L.E. endured at the school.[10] *See Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F.Supp.2d 304, 316 (S.D.N.Y. 2000) ("Actionable

---

[10] At this juncture, the Court is not ruling on whether the District had control over the Camp because it is not clear whether such a ruling is even relevant to L.E.'s Title IX claim.

sexual harassment is not limited to that committed by a current teacher, but includes that committed by former teachers, staff and even other students if the presence of the perpetrator at the institution would be expected to create a hostile environment.")

"In evaluating hostile environment claims, courts have adopted a 'totality of the circumstances' approach that rejects the disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment." *Id.* at 319. Therefore, the District cannot sever the Camp incident from any later harassment at the school.

The facts are much like those in *Doe v. Derby Board of Education*, 451 F. Supp. 2d 438 (D. Conn. 2006). In *Doe*, a male student sexually assaulted a female student off campus during the summer break. *Id.* at 440. Despite the timing and location of the assault, the District Court still held that the Board could be liable "for the post-assault school situation." *Id.* at 445. The male student never directly harassed the female student again, *id.* at 442, yet "even absent actual post-assault harassment by [him], the fact that he and [she] attended school together could be found to constitute pervasive, severe, and objectively offensive harassment." *Id.* at 444.

Similarly, in *Williams v. Board of Regents*, 477 F.3d 1282 (11th Cir. 2007), the Court held that the University may have violated Title IX even though the University did not have control over the harasser when he committed the initial, reported acts of harassment. *Id.* at 1296. The University knew of an applicant's past sexual misconduct, admitted him despite of his known history, and then "failed to adequately supervise [him]." *Id.* Then that student participated in a conspiracy to rape a female student in an

on-campus dormitory. *Id.* The University was potentially liable under Title IX because it "substantially increased the risk faced by female students" when it "plac[ed] [him] in a student dormitory and fail[ed] to supervise him in any way or to inform him of their expectations of him under the applicable sexual harassment policy." *Id.*

Though neither the Board in *Doe* nor the University in *Williams* had control over the distinct, reported incidents of harassment, they were both potentially liable to the extent that their deliberate indifference subsequently subjected their students to a hostile environment that was within their control. *Doe*, 451 F. Supp. 2d at 446; *Williams*, 477 F.3d at 1296. *See also Davis*, 526 U.S. at 644. Likewise, regardless of whether the District exercised substantial control over the Camp, it undoubtably exercised substantial control over the high school. Since L.E. claims to have been subjected to hostile learning environment at school, the Court finds the District is liable to the extent that its deliberate indifference to the sexual assault subjected L.E. to severe, pervasive, and objectively offensive harassment at the school.

## 2. Severe, Pervasive & Objectively Offensive Harassment

Second, the harassment must have been so severe, pervasive, and objectively offensive that L.E. was denied an educational benefit. *See Davis*, 526 U.S. at 633.

The District argues that the evidence does not support a finding that L.E. was subjected to severe, pervasive, and objectively offensive harassment following the attack. During his deposition, L.E. could only recall two specific incidents of harassment after the Camp. The District asserts that these incidents do not rise to the level necessary to establish a prima facie Title IX claim.

It is true that not all teasing or bullying gives rise to a valid Title IX claim. The

Supreme Court has explained:

> Courts . . . must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. . . . [A]t least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 U.S. at 651.

"Whether gender-oriented conduct rises to the level of actionable harassment

depends on a constellation of surrounding circumstances, expectation, and relationships,

including, but not limited to, the ages of the harasser and the victim and the number of

individuals involved." *Id.* (citations omitted). The Court explained that the "behavior

[must] be serious enough to have the systemic effect of denying the victim equal access

to an educational program or activity." *Id.* at 652.

After reviewing cases related to this issue, the District Court for the Eastern

District of California summarized:

> It is not necessary . . . to show physical exclusion to demonstrate that a student has been deprived of an educational opportunity by the actions of another student. [*Davis*, 526 U.S.] at 651. Rather, the harassment must have a "concrete, negative effect" on the victim's education or access to school-related resources. *Id.* at 654. Examples of a negative impact on access may include dropping grades, *id.* at 634, being diagnosed with behavioral and/or anxiety disorders, *Theno v. Tonganoxie Unified School District No. 464*, 377 F. Supp. 2d 952, 968 (D. Kan. 1005), becoming homebound or hospitalized

due to harassment, *see Murrell v. School District No. 1, Denver, Colorado*, 186 F.3d 1238, 1248-49 (10th Cir. 1999), physical violence, *see Vance v. Spencer County Public School District*, 231 F.3d 253, 259 (6th Cir. 2000), or sexual assault*, see Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282, 1299 (11th Cir. 2007).

*Roe v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1028 (E.D. Cal. 2009).

"Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect" the Supreme Court thought it "unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Davis*, 526 U.S. at 652–53.

However, the mere possibility of an interaction with an attacker may be considered sufficiently severe and pervasive harassment. For example, the *Roe* court quoted at length a decision from the District of Connecticut which explained:

> The mere fact that [Plaintiff] Mary Doe and Jesse attended school together could be found to constitute pervasive, severe, and objectively offensive harassment so as to deny Mary Doe equal access to school resources and opportunities. The evidence shows that Jesse was permitted to continue attending school with Mary Doe for three years after the assault, leaving constant potential for interactions between the two. Although the Defendant argues otherwise, a reasonable jury could conclude that Jesse's mere presence at the high school was harassing because it exposed [Plaintiff] to the possibility of an encounter with him.

> As potential interactions between Mary Doe and Jesse are enough to preclude summary judgment in favor of the Defendant, actual interactions between the victim and her assailant could also be found to create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided to her at school. The record shows that Mary Doe and Jesse shared a lunch period and class during their sophomore year, and shared a class together the first day of their junior year. Mary Doe

testified in her deposition that: "[Jesse] was always everywhere I looked. I always had to see him." Mary Doe also stated that her "prom memories are pretty much trashed because [she] saw [Jesse] the whole time." A jury could reasonably conclude that the circumstances were sufficiently pervasive, severe, and objectively offensive so as to detract from Mary Doe's educational experience.

*Roe*, 678 F. Supp. 2d at 1028 (quoting *Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009)).

Thus, the mere fact that L.E. continued to see and interact with his attackers at school may be enough to satisfy this element. Regardless, there is more evidence to support a finding that the harassment was so severe, pervasive, and objectively offensive that L.E. was denied equal access to educational opportunities.

Notably, there was more than a single incident of alleged harassment. Although L.E. could not remember many specific incidents, he testified at his deposition that the harassment he experienced at school was upsetting. Dkt. 43-3 at 10. He testified that M.D. frequently made jokes about L.E. being gay. *Id.* at 33. He also remembers M.D. saying, "You liked it in your ass." *Id.* At another time, J.W. told L.E. that he was "going to get raped at state," in reference to the state tournament. *Id.* at 57. While this comment may have simply been a prediction that L.E. would not perform well at the state tournament, the choice of words in light of the earlier attack at Camp is something a reasonable jury may conclude contributed to an environment of severe and pervasive sexual harassment.

Additionally, his father testified that L.E.'s demeanor and behavior changed after the Camp, leading to his ultimate suspension from school. Dkt. 43-2, at 93. A

psychologist concluded that L.E.'s "self-reported life-history strongly suggest[s] that he was deeply traumatized by the sexual assault perpetrated in July 2013 and that the assault effectively altered and compromised his life trajectory." *Id.* at 27. The psychologist diagnosed him with child sexual abuse, post-traumatic stress disorder, major depressive disorder, somatic symptom disorder, and alcohol use disorder. *Id.* at 26. Given the evidence of the assault's severity and effects, a reasonable jury could conclude that the presence of his attackers and any subsequent harassment created a hostile environment at school so severe, pervasive, and objectively offensive that it deprived L.E. of equal access to an educational opportunity or benefit.

### 3. Actual Knowledge

Third, the District must have had actual knowledge of the harassment. *See Reese*, 208 F.3d at 739. In order for a funding recipient to be subject to Title IX liability, "an official 'who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf [must have] actual knowledge of discrimination.'" *Id.* (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (9th Cir. 2000)). "Although the actual knowledge standard has been applied repeatedly by courts since *Gebser v. Lago Vista Indep. Sch. Dist.*, its contours have yet to be fully defined." *Crandell*, 87 F.Supp.2d at 320. "[I]t is difficult to define what kind of notice is sufficient." *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 397 (E.D. N.Y. 2005) (citation omitted).

Here, there is no dispute that the only District employee aware of the sexual assault at the Camp was Coach Lawler. There is also no dispute that L.E. never reported

the harassment he experienced at school to Coach Lawler, or any other District employee. Thus, the Court first considers whether Coach Lawler was an official who had the authority to address the harassment, and second, whether he had actual knowledge of the harassment.

i.    *Was Coach Lawler an appropriate official?*

The Tenth Circuit explained that "deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry." *Murrell v. Sch. Dist. No. 1 of Denver*, 186 F.3d 1238, 1247 (10th Cir. 1999). The Court declined "to name job titles that would or would not adequately satisfy this requirement" because school districts assign roles differently. *Id.* Some courts have found that teachers are appropriate officials when they were able to institute corrective measures. *See*, *e.g.*, *Id.* at 1248; *J.B. ex rel Bell v. Mead Sch. Dist. No. 354*, 2010 WL 5173164, at *5 (E.D. Wash. 2010). The requirement is simply that the school official is someone with "authority to address the alleged discrimination and to institute corrective measures on the [District's] behalf."[11] *Reese*, 208 F.3d at 739 (citation omitted).

---

[11] The District cites *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009), to support its contention that the actual knowledge requirement is only met if a school *administrator* has actual knowledge. However, that case does not explicitly say the requirement is *only* met if an administrator has actual knowledge. *Fitzgerald*, 555 U.S. at 257 ("For example, a Title IX plaintiff can establish school district liability by showing a single school administrator with authority to take corrective action responded to harassment with deliberate indifference.") (citing *Gebser*, 524 U.S. at 290 ("[a]n 'appropriate person' . . . [is] an official of the recipient entity with authority to take corrective action")). Additionally, the issue in that case was not whether a school violated Title IX but rather whether a Title IX claim precluded a § 1983 claim for an Equal Protection Clause violation. *Id.* at 258. Furthermore, cases before and after *Fitzgerald* use the "official who at a minimum has authority" language. *See*, *e.g.*, *Gebser*, 524 U.S. at 290; *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014); *Reese*, 208 F.3d at 739; *Lopez v. Regents of the Univ. of Cal.*, 5 F. Supp. 3d 1106, 1122 (N.D. Cal. 2013); *Roe*, 678 F. Supp. 2d at 1030 (E.D. Cal. 2009).

Here, Coach Lawler already said he believed it was his responsibility to respond to and correct the boys' behavior at the Camp. Presumably, once the school year began, Coach Lawler did not lose this ability to address the assault and institute corrective measures to prevent future harassment. After all, he had disciplined students' behavior on other occasions while school was in session. As a result, a reasonable jury could conclude that Coach Lawler had "authority to address the alleged discrimination and to institute corrective measures on the [District's] behalf" and thus was an appropriate official who had actual knowledge of the harassment.

*ii.    Did Coach Lawler have actual knowledge?*

Regardless, the District argues that—even if Coach Lawler had such authority— L.E. never actually reported the harassment he experienced *at school* to Coach Lawler or anyone else within the District. If that is the harassment he seeks to hold the District liable for, the District contends it must have had actual notice of that harassment—not just the sexual assault that occurred at Camp. Under the circumstances of this case, the Court disagrees.

While the District must have had actual knowledge of some harassment, "actual knowledge of every incident could not possibly be required." *See Crandell*, 87 F.Supp.2d at 320. Otherwise, a student would have to report each instance of harassment to an appropriate official even when the official was deliberately indifferent to earlier reports. In this case, L.E. reported that M.D. shoved a plunger into his anus, and beyond Coach Lawler asking the boys to apologize, there was no response. It would be unreasonable to bar L.E.'s Title IX claim simply because he did not report later instances of harassment

after the District did not do more in response to his assault.

The *Crandell* Court explained:

> [A]ctual knowledge of every incident could not possibly be required, as this would burden the plaintiff unfairly in cases of frequent harassment to report many separate incidents to the appropriate authorities and would oblige the court to determine whether each incident alleged was reported and therefore is actionable. Suffice it to say, in light of *Gebser*, that the institution at minimum must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based. This minimum standard is appropriate because it adopts *Gebser*'s focus on institutional culpability while not putting an unrealistically heavy burden on Title IX plaintiffs.

*Crandell*, 87 F.Supp.2d at 320.

As mentioned earlier, in *Doe v. Derby Board of Education*, the Court held a jury could find the school liable "for the post-assault school situation" even though the reported assault happened off campus and while school was not in session and even though the assaulter did not directly harass the victim again. *Doe*, 451 F. Supp. 2d at 440, 442, 445. Similarly, in *Williams*, the Court held that because the University knew of a student's past sexual misconduct before admitting him, the University could be liable under Title IX for his later acts of harassment. *Williams*, 477 F.3d at 1296.

Likewise, a jury may find that Coach Lawler's actual knowledge of the sexual assault at the Camp was sufficient to give the District adequate notice of subsequent harassment at school. While the District may not have exercised substantial control over the Camp, Coach Lawler's actual knowledge of the sexual assault did not disappear once his contract resumed, and school was back in session. A reasonable jury could find that the District—based upon what Coach Lawler knew—possessed enough knowledge of the

harassment when school was back in session that it reasonably could have responded with remedial measures to address the alleged harassment that L.E. was subjected to at school. *See Doe A. v. Green*, 298 F. Supp. 2d 1025, 1034–35 (D. Nev. 2004) ("Clearly, prior complaints made by the same student . . . provide[] actual notice, even if the conduct complained of was not identical to the conduct with the plaintiff alleges should have been remedied.").

### 4. Deliberate Indifference

Fourth, the District is only liable for damages under Title IX where it remained deliberately indifferent to known acts of harassment. *See Davis*, 526 U.S. at 642–43.

The District asserts that it was not deliberately indifferent. It argues that upon learning of the attack, Coach Lawler immediately responded to the information he received, talked to the boys involved, and made them apologize. Additionally, once another District employee became aware of the assault two years later, the police and appropriate authorities were notified.

L.E. disagrees with the District's assessment. He states:

Upon receiving actual notice that Defendants M.D, J.W. and R.R. had sodomized the Plaintiff with a plunger handle, Coach Lawler told the three defendants to apologize. Lawler took no further action even though Idaho law required him to report this conduct to appropriate law enforcement officials and/or the Department of Health and Welfare pursuant to I.C. §16-1605. When the Superintendent of the District and the Assistant Superintendent of the District/Title IX officer received confirmation that Defendants M.D., J.W. and R.R. had sodomized the Plaintiff with a plunger handle approximately two years later, they also took no action against Defendants M.D., J.W. and R.R. Furthermore, the District affirmatively adopted Coach Lawler's deliberately indifferent conduct by stating that his conduct did not warrant a reprimand, did not warrant an investigation by the

Profession Standards Commission (PSC), and that there was no wrong-doing on the part of Coach Lawler.

Dkt. 43, at 17 (citations omitted).

A school's response is deliberately indifferent where the response is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. In other words, the question is whether the school "made 'an official decision . . . not to remedy the violation.'" *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (quoting *Gebser*, 524 U.S. at 290) (alteration in original).

"[S]chool administrators are entitled to substantial deference when they calibrate a disciplinary response to student-on-student bullying or harassment." *S.B. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 77 (4th Cir. 2016). "An aggrieved party is not entitled to the precise remedy that he or she would prefer." *Oden*, 440 F.3d at 1089.

However, if "an institution either fails to act, or acts in a way which could not have reasonably been expected to remedy the violation, then the institution is liable for what amounts to an official decision not to end discrimination." *Green*, 298 F. Supp. 2d at 1034–35 (citing *Gebser*, 524 U.S. at 290).

Other district courts in the Ninth Circuit have recognized that a deliberate indifference inquiry generally does not lend itself well to a determination by the Court on summary judgment. *See K. S-A v. Haw.*, 2018 U.S. Dist. LEXIS 78145, 2018 WL 2144143, at *12 (D. Haw. 2018); *Lilah R. ex rel. Elena A. v. Smith*, 2011 U.S. Dist. LEXIS 81023, 2011 WL 2976805, at *5 (N.D. Cal. 2011); *Green*, 298 F. Supp. 2d at 1036. However, the Supreme Court has established that "[i]n an appropriate case, there is

no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

However, in this case, a reasonable jury could find that the District's disciplinary response was clearly unreasonable. The whole of the District's disciplinary response was Coach Lawler making the boys apologize. A reasonable jury could find that the apologies were clearly inadequate to remedy what M.D., J.W., and R.R. did to L.E and that the apologies could not reasonably have been expected to prevent further harassment. Importantly, the District also failed to take any measures to protect L.E. from M.D., J.W., or R.R. once school was back in session. A reasonable jury could find this was deliberately indifferent to what the District (through Coach Lawler) knew happened at the Camp.

Accordingly, because there are genuine disputes regarding material facts in this case, and because a reasonable jury could find that the District violated Title IX by inadequately responding to the assault of L.E., the District's Motion for Summary Judgment is DENIED.

## V. ORDER

THE COURT HEREBY ORDERS:

1. The District's Motion for Summary Judgment (Dkt. 42) is DENIED.

2. The District's Motion to Strike (Dkt. 45) is GRANTED in PART and DENIED in PART. The Court strikes the Declaration of Sokolov (Dkt. 43-5). However, the

Court does not strike the letters, M.D.'s confession, or Assistant Superintendent

Sexton's 30(b)(6) deposition answer.

DATED: August 13, 2019

David C. Nye
Chief U.S. District Court Judge